**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KARLIN JOKELA,                          No. C-05-2268 JCS

        Plaintiff,                **ORDER GRANTING PLAINTIFF'S**
                                        **MOTION FOR SUMMARY**
    v.                          **JUDGMENT, DENYING DEFENDANT'S**
                                        **CROSS-MOTION FOR SUMMARY**
JOANNE B. BARNHART,                     **JUDGMENT AND REMANDING FOR**
                                        **FURTHER PROCEEDINGS**
        Defendant.                **[Docket Nos. 15, 18]**
_____/

**I.      INTRODUCTION**

      Plaintiff, Karlin Jokela, filed a complaint on June 3, 2005, seeking review of the final
decision of the Commissioner of Social Security ("Commissioner") denying her application for
disability benefits under Title II and/or Title XVI of the Social Security Act.  Plaintiff asks the Court
to reverse the Commissioner's decision and award benefits, or in the alternative, for an order
remanding the matter for further administrative proceedings.

      Plaintiff applied for disability benefits on August 12, 2002, alleging the onset of her
disability was April 4, 2002.  The application was denied initially and on reconsideration.  Plaintiff
made a timely request for a hearing, and a hearing was held on February 9, 2004 before an
Administrative Law Judge ("ALJ") in San Rafael, California.  At the hearing, testimony was taken
from Plaintiff and a vocational expert, Robert Rashke.  Plaintiff was represented at the hearing by
Dan McCaskell, Ph.D., a claimant representative.  On April 30, 2004, the ALJ issued a decision
finding Plaintiff was not disabled as defined in the Social Security Act, and denying her request for
benefits. This decision became final when the Appeals Council declined to review the ALJ's
decision, on March 29, 2005.

**United States District Court**
For the Northern District of California

1    Plaintiff filed a Motion for Summary Judgment (the "Motion") on December 2, 2005, and the

2  Commissioner filed a Cross-Motion for Summary Judgment (the "Cross-Motion") on January 31,

3  2006.  Plaintiff filed her Reply ("Reply") on February 2, 2006.  The parties have consented to the

4  jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

5  **II.    BACKGROUND**

6          **A.    Plaintiff's Background**

7    Plaintiff was 41 years old as of the alleged onset date of her disability, April 4, 2002.

8  Administrative Record ("AR") at 105 (date of birth 12/11/60), 96 (onset of disability 4/4/02).  She

9  completed high school in June 1979.  AR at 102.  In 1989, Plaintiff was diagnosed with

10  fibromyalgia.  AR at 103.  Until 1994, Plaintiff was self-employed as a full-time housekeeper.  AR

11  at 97.  In 1994, however, she gave up her house-cleaning business due to fatigue resulting from

12  fibromyalgia.  AR at 96.  Plaintiff reported that around that time, she came home from work and

13  went straight to bed on bad days, had no social activities, and began to gain weight.  AR at 103.

14  Plaintiff applied for Social Security Disability benefits on February 9, 1994.  AR at 18.  That

15  application was denied on July 12, 1994, and there is no mention of an appeal of the decision in the

16  record.  *Id.*  Beginning in 1994 or 1995, Plaintiff began working full time as a housecleaner at a

17  skilled nursing facility or hospital.  *See* AR 97 (start date listed as 11/94), 109 (start date listed as

18  11/95).  Plaintiff left this job in either October 1995 or October 1996.  *See* AR at 97 (departure dated

19  listed as 10/95), 109 (departure date listed as 10/96).  Plaintiff fell and hurt her knee in the fall of

20  1995, which she reports exacerbated her fibromyalgia pain.  AR at 103.  After this injury, her weight

21  increased into the morbidly obese range, to more than 300 pounds.  AR at 156.  Plaintiff then moved

22  to a full-time administrative assistant position, which she held from October 1995 or 1996 until

23  February 2000.  AR at 97 (start date listed as 10/95), 109 (start date listed as 10/96).  In this position,

24  she provided clerical services for about 17 people, including collecting and analyzing data to prepare

25  Power Point productivity reports for management.  AR at 324.

26    In 1997, Plaintiff took on the care of her young niece and nephew.  AR at 103.  She reports

27  that the combination of the childrens' illnesses and her own health problems caused her to be absent

28  from work often, leading to warnings from her employer.  AR at 103.  She also reports that during

2

**United States District Court**
For the Northern District of California

1 this time work was stressful and hard to handle due to constant pain. AR at 325. In 2000, Plaintiff

2 moved to a part-time position as an administrative assistant in another industry. AR at 97. Plaintiff

3 left this part-time employment in 2002, reporting that constant body pain, shoulder and wrist pain in

4 particular, along with diarrhea and incontinence, made it difficult for her to perform work functions

5 or attend work regularly. AR at 326. Plaintiff has not worked since April 4, 2002, AR at 96, and

6 filed a claim for disability benefits on August 12, 2002. AR at 17. In late July 2002, Plaintiff was

7 also involved in proceedings to adopt her niece and nephew. AR at 103. The adoption was finalized

8 in October 2003. AR at 332.

9       Plaintiff completed two Daily Activities Questionnaires, one for her original application,

10 dated September 26, 2002, AR at 117-22, and one when she requested reconsideration of the original

11 denial of benefits, dated February 19, 2003. AR at 143-48. In the earlier questionnaire, she

12 describes her activities as consisting of rising at 7:00 a.m., getting her two children ready for school,

13 driving them to school, then napping for two to three hours. AR at 117. She then does some

14 housecleaning and laundry, in bits and pieces as her pain and fatigue allow, before driving to retrieve

15 the children from school at 3:15 p.m. *Id.* Due to her arm and knee pain and obesity, Plaintiff reports

16 she cannot crouch, get on her knees, carry or reach well, so the children perform tasks requiring

17 those movements, like taking out the trash and cleaning the floor. AR at 118. Three days a week

18 she drives herself to physical therapy or psychotherapy sessions, and she does grocery shopping

19 every week or two. AR at 118-19. She spends evenings sitting at the table helping the children with

20 homework and making dinner. *See* AR at 117, 333. Plaintiff reports sleep apnea requiring use of a

21 Continuous Positive Airway Pressure machine ("CPAP")[1] and medication to sleep. AR at 117.

22 Plaintiff states that she wakes a couple times during the night and has trouble rising in the morning.

23 AR at 117. She reports enjoying hobbies such as painting, crafts, gardening, pencil puzzles, and

24 participating in the childrens' school parent council once or twice a month, but engages in few

25 social activities except with family. AR at 118, 120. In the questionnaire dated February 13, 2003,

26

27       [1] A CPAP is used to alleviate snoring and sleep apnea by creating pressure to keep the nasal

28 airway open.

United States District Court

For the Northern District of California

1  Plaintiff's description of her daily schedule is essentially the same, except that she states that she has

2  lost interest in most of her hobbies and now usually sleeps instead.  AR at 144.

3          At the February 9, 2004 hearing, Plaintiff testified concerning her pain symptoms, reporting

4  pain, numbness, and trembling in her arm, wrist, and fingers such that she cannot type.  *See* AR at

5  327-38, 121.  She testified that she suffers from diarrhea and incontinence, which, coupled with her

6  obesity and her pain-induced lack of flexibility, make daily hygiene a challenge.  AR at 326-27.

7  Plaintiff also testified that she experiences thigh, hip and knee aching, soreness, and tenderness, such

8  that she cannot sit more than 45 minutes, or stand more than 15 minutes at a time, without needing to

9  take a break and lie down.  AR at 330.  Plaintiff testified that although she does not go on long trips

10  "at all" and normally does not drive further than the grocery store or her children's school, she drove

11  herself to the hearing, a trip that took two hours and 10 minutes, by surrounding herself with pillows

12  to avoid hurt and  "grit[ting] her teeth."  AR at 331.

13          Plaintiff also provided Daily Activities Questionnaires filled out by her mother, Janice

14  Johnson, and a friend, Stephanie Halvorsen.  AR at 123-28, 137-42.  In a questionnaire dated

15  September 23, 2002, Johnson described Plaintiff's "typical day" as follows:

16              Gets up at 7AM to talk [sic] children (2) 7 + 9 to school.  Comes back
             home eats something + goes back to bed for a couple of hours.  Does
17              light chores in kitchen + laundry.  Picks up kids @ 3 PM.  Comes
             home + tends to children's needs.
18

19  AR 123.  According to Johnson, Plaintiff shops once a week, cooks for her children and does

20  laundry twice a week.  AR 12-125.  She states that the children help "with lifting clothes for

21  washer," AR at  125, and that when Plaintiff is doing chores, she "needs help with things in low

22  cupboards."  AR at 125.  Halvorsen, in her questionnaire dated February 16, 2003, also states that

23  Plaintiff's "typical day" includes taking her children to school and then coming home and going to

24  bed.  AR 137.   Halvorsen stated further that "every time I call her she's sleeping."  AR at 137.

25          **B.      Medical Evidence**

26                  **1.      Physical Health**

27          Treatment records from Dr. Thomas Paukert, beginning in 2001, describe his monitoring and

28  treatment of conditions including diet-controlled diabetes, asthma, depression, and fibromyalgia.

**United States District Court**
For the Northern District of California

1  AR at 225-26.  The records list Plaintiff's height as five feet four inches, and her weight as 312

2  pounds in November 2001.  AR at 224.  When Plaintiff was discharged from the hospital in March

3  2003, after a fall that resulted in a five-day hospital stay, Dr. Paukert noted that the MRI showed no

4  evidence of bony or soft tissue abnormality.  AR at 257-60.  Dr. Paukert assessed Plaintiff's

5  functional capacity on October 6, 2003.  AR at 285-86.  In his opinion, Plaintiff could stand or walk

6  for up to two hours at a time for no more than a total of two hours in an eight hour workday, and

7  could sit for up to two hours at a time for no more than a total of four hours in the work day.  AR at

8  285.  She could perform only intermittent low-force work with her feet or legs, could not come in

9  contact with particulates due to her asthma, could not work in cold or damp conditions due to

10 fibromyalgia, and could "never" climb, balance, stoop, kneel, crouch or crawl.  AR at 285-86.  With

11 respect to reaching, Dr. Paukert checked the "frequently" box for reaching in the waist to chest range

12 and the "occasionally" box for reaching in the ranges identified as "below knees," "chest to

13 shoulders" and "above shoulders."  AR at 286.  However, in his written comments, Dr. Paukert

14 stated that Plaintiff is "unable to raise her arms above shoulder level."  AR at 286.  He stated that she

15 would require two hands to carry 8 pounds and could only occasionally lift 10 pounds. *Id.*

16      Plaintiff was referred by Dr. Paukert to Dr. Marko Bodor for examination of her

17 musculoskeletal and fibromyalgia complaints.  AR at 239.  In his May 2002 assessment, Dr. Bodor

18 recorded shoulder, neck, lower back, knee, and foot pain, diabetes, impaired sleep, severe obesity,

19 fifth finger numbness, and a history of substance abuse.  AR at 239-40.  Dr. Bodor's report

20 characterized Plaintiff's chronic pain as due to obesity, which created an increased load on her joints

21 and tendons.  AR at 240.  He also found that Plaintiff's impaired sleep contributed to her chronic

22 pain because it limited the rate of regeneration.  AR at 240.  He found no evidence of carpal tunnel

23 syndrome.  *Id.*  Dr. Bodor prescribed phentermine for weight loss and gave Plaintiff an injection for

24 her shoulder pain.  AR at 239-40.  In a July 2002 visit, Plaintiff reported the injection had alleviated

25 her shoulder pain for two months.  AR at 238.  She had lost 7 pounds.  *Id.*  She received additional

26 injections for pain in her shoulders and knees.  *Id.*  At a September 2002 follow-up visit, Plaintiff

27 had lost 10 pounds, and she received another shoulder injection.  AR at 237.  At that visit, Plaintiff

28 told Dr. Bodor that the knee injections given during her previous visit had not been helpful.  AR at

**United States District Court**
For the Northern District of California

1   237.

2          Plaintiff was later referred by Dr. Paukert to Dr. Corby Kessler for treatment of her

3   fibromyalgia complaints.  AR at 290.  Fragments of evaluation records from December 2003 noted

4   continuing weight loss, some limitation in movement of the spine due to obesity, soft tissue

5   tenderness consistent with fibromyalgia and chronic fatigue syndrome.  *Id.*  Discussing Plaintiff's

6   foot problems, Dr Kessler noted that her footwear was inappropriate and lacked support.  *Id.*  On

7   examination, the report noted that Plaintiff displayed no abnormal pain behaviors, was alert and

8   cooperative, and her cognition was intact and appropriate.  *Id.*  Dr. Kessler recommended that a

9   more aggressive approach to weight loss be taken.  *Id.*  In treatment notes from January 2004,

10  Plaintiff reported a 40% improvement due to medication changes, a reduction in stiffness upon

11  walking, improved sleep, "looser joints," and a general increase in mobility.  AR at 288.  Plaintiff

12  reported being able to get down stairs without holding onto the wall.  *Id.*  Plaintiff reported that she

13  continued to be sleepy in the daytime.  *Id.* The examination notes described normal extremity

14  strength and functional spine movement.  *Id.*

15              **2.      Mental Health**

16          Plaintiff's therapist, Nancy Waldeck, provided two documents addressing Plaintiff's mental

17  health: a "Short-Form Evaluation for Mental Disorders" ("Short Form"), dated November 6, 2002,

18  AR at 186-89, and a "Medical Source Statement Concerning the Nature and Severity of an

19  Individual's Mental Impairment" ("Medical Source Statement"), dated August 5, 2003.  AR at 241-

20  43.  She did not provide any treatment notes, although she reported treating Plaintiff for depression

21  on a weekly basis beginning in April 2001.  *See* AR at 186.

22          In the Short-Form, Waldeck described Plaintiff as having no significant mental health related

23  restrictions.  *See* AR at 186-89.  In particular, Waldeck described as "unlimited" Plaintiff's abilities

24  to: 1) "[u]nderstand, remember, and carry out complex instructions," 2) to "maintain concentration,"

25  and 3) "[c]omplete a normal workday and workweek without interruptions from psychologically

26  based symptoms."  AR at 187-88.  Waldeck stated that Plaintiff had no problems with regard to

27  perception or thought processes, although she categorized Plaintiff's mood as depressed and

28

United States District Court

For the Northern District of California

1    described Plaintiff as having an addictive personality.  *Id.*  Waldeck also noted that Plaintiff was

2    "slightly distracted."  AR at 186.

3         On the other hand, in the later Medical Source Statement, Waldeck described much more

4    serious mental health impairments.  *See* AR at 241-43.  In this statement, Waldeck listed as

5    "markedly limited" Plaintiff's abilities to: 1) "maintain attention and concentration for extended

6    periods; " 2) "carry out detailed instructions;" 3) "perform activities within a schedule;" 4) "make

7    simple work-related decisions;" 4) "accept instructions and respond appropriately to criticism;" and

8    5) "complete a normal workday and workweek without interruptions from psychologically based

9    symptoms."  *Id.*  She reported most other functions as "moderately limited."  *Id.*  In a handwritten

10   note on the last page of the form, Waldeck acknowledged the discrepancy between the November

11   2002 and August 2003 assessments.  AR at 243.  Waldeck explained that when she completed the

12   earlier assessment, Plaintiff had been minimizing her symptoms of depression and inability to

13   concentrate because she was afraid that Waldeck would stand in the way of Plaintiff's adoption of

14   her niece and nephew if she were aware of these problems.  *Id.*  Waldeck believed that Plaintiff was

15   more honest in the later assessment, once she learned that Waldeck was in favor of the adoption.  *Id.*

16   Waldeck concluded that the later assessment was a more accurate evaluation of Plaintiff's mental

17   health.  *Id.*

18        Plaintiff was referred to Dr. Janet Cain, Ph.D., by the Bureau of Disability Determination for

19   psychological evaluation.  AR at 175-77.  In notes based on an interview that took place on

20   September 27, 2002, Dr. Cain found Plaintiff to be mildly to moderately depressed.  AR at 176.  She

21   noted that Plaintiff did not move with restricted range of motion nor appear to be in severe pain,

22   although Plaintiff emphasized her pain symptoms in the interview.  AR at 176.  Dr. Cain noted that

23   Plaintiff's politeness and cooperation were not consistent with a person in severe pain.  AR at 176-

24   77.  Dr. Cain observed that Plaintiff had average cognitive abilities, and expressed the opinion that

25   Plaintiff should be able to follow simple instructions.  AR at 177.  However, Dr. Cain emphasized

26   that Plaintiff's pain and obesity might make it difficult to perform rapid motions in the workplace,

27   and that her attendance at work might be problematic.  *Id.*  Due to Plaintiff's depression and

28

**United States District Court**
For the Northern District of California

1    emphasis on her pain syndrome, Dr. Cain thought Plaintiff might have trouble responding to co-

2    workers and others.  *Id.*

3            Plaintiff also was examined by clinical psychologist Jay L. Danzig, Ph.D., who completed a

4    vocational assessment.  AR at 244-51.  Dr. Danzig found that Plaintiff was in the 90th percentile for

5    reading comprehension, 85th percentile for verbal reasoning, and 70th percentile for vocabulary,

6    indicating that she would be "able to handle the reading requirements of virtually any occupational

7    area" and that she has "a good ability" to communicate with others.  AR at 244.  On the other hand

8    Plaintiff was at the 30th percentile "with poor accuracy in her ability to work with detailed clerical

9    material." ARR at 244.  According to Dr. Danzig, Plaintiff's "clerical speed and accuracy is far

10   below acceptable industry standards with respect to her returning to office occupations." AR at 244-

11   45.  Dr. Danzig reported that her MPPI[2] results, although a bit compromised because of random

12   responses at the end of the test, correlated with individuals who consciously over-report their

13   psychopathology and present themselves in the worst light.  AR at 248.  Dr. Danzig suggested that

14   Plaintiff might be presenting herself as a victim in order to receive help.  *Id.*  He also found

15   Plaintiff's responses were consistent with long-term clinical depression and an addictive personality.

16   *Id.*  Dr. Danzig thought that Plaintiff might find work situations difficult due to her introverted

17   personality, discomfort around others, inability to tolerate frustration, and sensitivity to criticism that

18   would cause her to abandon tasks if criticized.  AR at 248-49.  Dr. Danzig wrote that Plaintiff's

19   ability to sustain concentration and attention might need further testing.  AR at 249.  Due to her

20   health complaints, as well as her state of worry, Dr. Danzig thought Plaintiff might not be "ready to

21   pursue competitive employment outside of the home." *Id.*

22           **C.     The  ALJ's Five-Step Analysis and Findings of Fact**

23           Disability insurance benefits are available under the Social Security Act when an eligible

24   claimant is unable "to engage in any substantial gainful activity by reason of any medically

25   determinable physical or mental impairment . . . which has lasted or can be expected to last for a

26

27   _____

28           [2] Presumably, these initials refer to the Minnesota Multiphasic Personality Inventory test, used
     to evaluate personality and psychopathology characteristics.

**United States District Court**
For the Northern District of California

1   continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

2   § 423(a)(1).  A claimant is only found disabled if her physical or mental impairments are of such

3   severity that she is not only unable to do his previous work but also "cannot, considering his age,

4   education, and work experience, engage in any other kind of substantial gainful work which exists in

5   the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the burden of proof in

6   establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881

7   (1996).

8           The Commissioner has established a sequential five-part evaluation process to determine

9   whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a).  At Step One,

10  the Commissioner considers whether the claimant is engaged in "substantial gainful activity."  20

11  C.F.R. § 404.1520(a)(4)(I).  If she is, the Commissioner finds that the claimant is not disabled, and

12  the evaluation stops.  If the claimant is not engaged in substantial gainful activity, the Commissioner

13  proceeds to Step Two and considers whether the claimant has "a severe medically determinable

14  physical or mental impairment," or combination of such impairments, which meets the duration

15  requirement in 20 C.F.R. § 404.1509.  An impairment is severe if it "significantly limits [the

16  claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  If the

17  claimant does not have a severe impairment, disability benefits are denied at this step.  If it is

18  determined that the impairments are severe, the Commissioner will next perform Step Three of the

19  analysis, comparing the medical severity of the claimant's impairments to a compiled listing of

20  impairments that the Commissioner has ratified as disabling.  20 C.F.R. § 404.1520(a)(4)(iii).  If one

21  or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is

22  found to be disabled.  Otherwise, the Commissioner proceeds to Step Four and considers whether the

23  claimant, in light of his impairments and residual functional capacity ("RFC"), can still perform

24  work she has performed in the past.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can still

25  perform previous work, she is found not to be disabled.  If the claimant cannot perform past relevant

26  work, the Commissioner performs the fifth and final step of the analysis.  20 C.F.R. §

27  404.1520(a)(4)(v).  At Step Five, the burden shifts to the Commissioner to show that the claimant, in

28  light of her impairments, age, education, and work experience, can adjust to other work in the

1  national economy.  *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).  A claimant who is

2  found able to make the adjustment to other work is not considered disabled, and will not receive

3  disability benefits.  20 C.F.R. § 404.1520(f).

4          At Step One, the ALJ in this case found that Plaintiff had not engaged in any substantial

5  gainful activity since April 4, 2002.  AR at 18.

6          At Step Two, he found that Plaintiff suffered from diabetes, irritable bowel syndrome,

7  obesity, sleep apnea, either fibromyalgia or chronic fatigue syndrome, fallen arches, bilateral

8  shoulder bursitis, dysthemia, major depressive disorder, personality disorder and NOS.  *Id.*  The ALJ

9  found that the evidence did not show any addiction to pain medication, and considered Plaintiff's

10  history of drug and alcohol abuse to be in remission.  *Id.*  The ALJ concluded that Plaintiff's

11  combination of impairments was "severe."

12          At Step Three, the ALJ found that Plaintiff's impairments did not meet or equal any listed

13  impairment which is considered conclusively disabling. *Id.*

14          At Step Four, the ALJ considered Plaintiff's RFC.  Although he found that there were

15  medically established disorders that could have reasonably caused Plaintiff's pain symptoms, the

16  ALJ did not find Plaintiff's testimony about the intensity, persistence and limiting effects of her pain

17  to be "entirely credible."  AR at 23.  He pointed to inconsistencies in Plaintiff's testimony that

18  diminished her credibility, including her testimony that she cares for her niece and nephew, drives to

19  and from school, drives to therapy three times a week, shops, prepares meals, does laundry and other

20  household chores, and, on a limited basis, pursues hobbies of painting, crafts and gardening.  AR at

21  23.  The ALJ also cited to the following: (1) Dr. Danzig's MMPI results suggesting exaggeration of

22  symptoms, (2) Waldeck's report that Plaintiff manipulated interview results, and (3) Dr. Cain's

23  report that Plaintiff's behavior was not consistent with extreme pain.  AR at 22-23.  The ALJ

24  considered Plaintiff's behavior at the hearing to be inconsistent with a person in severe pain.  AR at

25  23.  The ALJ did not mention or discuss in his ruling the lay testimony of Janice Johnson or

26  Stephanie Halvorsen.

27          The ALJ agreed with Dr. Cain, Dr. Danzig and Waldeck that Plaintiff would be limited to

28  simple work tasks because of her depression, and that her contact with co-workers and the general

**United States District Court**
For the Northern District of California

1   public should be limited because of her depression and personality disorder combined.  AR at 22.

2   He agreed with Dr. Cain and Dr. Danzig that Plaintiff's cognitive functioning was in the average

3   range, and that she would be capable of performing simple work tasks.  *Id.*  The ALJ gave "minimal

4   weight" to therapist Waldeck's assessment that Plaintiff's mental health indicated moderate to

5   marked limits on her ability to work.  *Id.*  The ALJ concluded that Waldeck's explanation for the

6   discrepancy between the Short Form and Medical Source Statement was not persuasive because

7   Waldeck had provided no treatment notes or records that documented the change in behavior

8   between first and second assessments, because her opinion differed from those of Dr. Danzig and

9   Dr. Cain, and because her assessment was contradicted by Plaintiff's daily activities.  *Id.*  The ALJ

10  also discounted Dr. Danzig's recommendations to the extent that they were based on Plaintiff's self-

11  reported pain symptoms, which the ALJ had found not fully credible.  *Id.*

12          The ALJ agreed with much of Dr. Paukert's assessment of Plaintiff's physical working

13  capability, but the ALJ disagreed with Dr. Paukert to the extent that the ALJ concluded that Plaintiff

14  could sit for up to six hours in an eight hour workday rather than only four hours, and that Plaintiff

15  could occasionally crawl, kneel, stoop, crouch, climb stairs or ramps, and balance (activities Dr.

16  Paukert said Plaintiff could never performs).  *See* AR at 21-22.  The ALJ did not adopt Dr. Paukert's

17  findings with regard to crawling, kneeling and other maneuvers because he found that Dr. Paukert's

18  treatment regimen had been "essentially conservative and fails to support a preclusion from these

19  postural maneuvers," and because "claimant's reported daily activities reflect that these functions

20  are performed on an occasional basis."  AR at 21.  The ALJ rejected Dr. Paukert's finding that the

21  Plaintiff could only sit for four hours in a workday because he found an "absence of significant

22  musculoskeletal abnormalities."  AR at 21.  Likewise, the ALJ found there was no "medical

23  evidence of significantly abnormal clinical signs or aggressive treatment" that would support the

24  loss of ability for repetitive motion in the hands.  AR at 21.  The ALJ stated that he had "considered

25  the obesity and its effect on claimant's physical capacity for work." AR at 22.

26          At Step Five, the ALJ, citing to the testimony of the vocational expert, found that there are

27  significant employment options in the national economy for someone with Plaintiff's RFC.  AR at

28  25.  The ALJ's conclusion was based on testimony that a person with the limitations of occasional

1   stooping or crawling, sitting up to six hours with a sit/stand option every 45 minutes, limited co-
2   worker or public contact, and no ladders, fumes or dust, or footwork, would have a significant
3   number of employment options in the national economy, and that a restriction on overhead reaching
4   would only erode those options by only 10-15%.  AR at 24.

5        Based on this testimony, the ALJ found that the Plaintiff was not disabled for the purposes of
6   Title II and/or Title XVI of the Social Security Act.  *Id.*

7        **D.       Contentions of the Parties**

8        The dispute in this case involves the ALJ's determinations at Steps Four and Five of the
9   framework described above. The ALJ found that although Plaintiff's medical impairments are, in
10   combination, severe, Plaintiff is not disabled because she retains an RFC to perform work that is
11   available in the national economy.  Plaintiff challenges this finding, asserting that the ALJ, in
12   determining her RFC, improperly failed to consider lay testimony about Plaintiff's limitations, and
13   failed to consider the effect of Plaintiff's obesity, in combination with her other impairments, on the
14   RFC.  Plaintiff further asserts that the ALJ's hypothetical questions to the vocational expert did not
15   accurately reflect Plaintiff's limitations.  As a result, Plaintiff asserts, the testimony of the vocational
16   expert does not establish that there are jobs available for individuals with Plaintiff's limitations.

17        The Commissioner argues that the ALJ properly disregarded the lay testimony of Plaintiff's
18   mother and Stephanie Halvorsen, and properly evaluated the combined effect of Plaintiff's
19   impairments, including her obesity.  The Commissioner further contends that the hypothetical
20   questions posed to the vocational expert accurately reflected the ALJ's RFC determination, and that
21   the ALJ properly developed the administrative record.

22   **III.     ANALYSIS**

23        **A.       Legal Standard**

24        When asked to review the Commissioner's decision, the Court takes as conclusive any
25   findings of the Commissioner which are free from legal error and supported by "substantial
26   evidence."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might
27   accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).
28   Substantial evidence means "more than a mere scintilla," *id.*, but "less than a preponderance."

*Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988).  Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when weighing the evidence and in reaching a decision.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).  In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

**B.      The ALJ's Consideration of Lay Testimony**

Plaintiff asserts that the ALJ erred in failing to provide reasons for rejecting the statements of Janice Johnson and Stephanie Halvorsen in their Daily Activity Questionnaires.  The Commissioner, on the other hand, asserts that the statements could be ignored by the ALJ because: 1) the statements were not sworn under penalty of perjury and therefore need not be considered; and 2) the ALJ "implicitly" discounted these statements because they were based on Plaintiff's own subjective complaints, which the ALJ properly found to be not entirely credible.  The Court concludes that the ALJ erred in disregarding the testimony of the lay witnesses and that as a result, his finding that the Plaintiff is not disabled is not supported by substantial evidence.

First, the Court rejects the Commissioner's assertion that the Daily Activities Questionnaires completed by Johnson and Halvorsen need not be considered by the ALJ because they were not sworn under penalty of perjury.  It is well-established that in evaluating a claimant's subjective complaints of pain or other symptoms, the ALJ "must give full consideration to *all* the available evidence."  *Smolen*, 80 F.3d at 1285 (emphasis added); *see also Schneider v. Comm'r of Soc. Sec. Admin.*, 223 F.3d 968 (9th Cir. 2000) (finding error where an ALJ failed to consider five letters that the claimant's friends and ex-employers had submitted).  ALJs routinely rely on Daily Activities Questionnaires such as the ones at issue here and indeed, the ALJ in this case expressly cited to Plaintiff's Daily Activities Questionnaire in his written decision.  AR at 23.  The Commissioner has not cited to any authority in support of the proposition that an ALJ may disregard the statements of lay witnesses simply on the basis that they are contained in a Daily Activities Questionnaire.  Nor has the Court found any such authority.  Therefore, the Court rejects the Commissioner's contention that the ALJ was not required to consider this evidence.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1    The Court considers next the Commissioner's assertion that the ALJ's failure to discuss the

2    lay witness statements was, essentially, harmless error, because the lay witness statements

3    duplicated Plaintiff's pain testimony, which the ALJ properly found was not entirely credible.  In the

4    Ninth Circuit, it is established that an ALJ "need not discuss *all* evidence presented," but rather,

5    must explain only why "significant probative evidence has been rejected."  *Vincent v. Heckler*, 739

6    F.2d 1393.  In *Vincent*, the court affirmed the decision of the ALJ, even though he did not discuss in

7    his decision lay testimony about the claimant's impairments, because the court found that the ALJ's

8    findings were supported by medical evidence that contradicted the lay testimony.  *Id*.  In a

9    subsequent decision, the Ninth Circuit explained that in *Vincent*, the ALJ was not required to

10   provide reasons for disregarding the lay testimony because the lay witness purported to make a

11   medical *diagnosis* – something lay witnesses are not competent to testify about –  and therefore, the

12   evidence was not "probative."  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

13   In contrast, lay witnesses *are* competent to testify about how a claimant's symptoms affect

14   his ability to work.  *Id*.  For example, in *Nguyen*, the court held that the ALJ erred when he failed to

15   consider testimony by both the claimant and his wife that the claimant had a serious coughing

16   problem.  *Id*.  Consequently, the ALJ did not include in his hypothetical to the vocational expert a

17   limitation reflecting this symptom.  *Id*.  The court held that the ALJ could only reject the testimony

18   of the lay witness (the claimant's wife) if he gave reasons that were "germane" to that witness.  *Id*.

19   (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)).  The court further held that because the

20   ALJ did not include the coughing limitation in the hypothetical to the vocational expert, the

21   conclusion that there was work available in the national economy that the claimant could perform

22   was not supported by substantial evidence.  *Id*.

23   Here, Plaintiff relies on *Nguyen* in support of her assertion that the ALJ was required to give

24   specific reasons for rejecting the testimony of the lay witnesses, Johnson and Halvorsen.  The

25   Commissioner, however, cites to an Eighth Circuit case in which the court held that an ALJ's failure

26   to discuss testimony about a claimant's symptoms did not require dismissal because the lay

27   testimony was discredited by the same evidence that was cited by the ALJ to discredit the claimant's

28   testimony.  *See Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995).  Although there appears to be

**United States District Court**
For the Northern District of California

1  no Ninth Circuit case that directly addresses whether this approach is consistent with Ninth Circuit

2  precedent, at least one district court within the Ninth Circuit has concluded that it is. *See Orcutt v.*

3  *Barnhart*, 2005 WL 2387702 (C.D. Cal.). In *Orcutt*, the court held that where the testimony of the

4  lay witness simply corroborated the testimony of the claimant, failure to discuss the lay testimony

5  was harmless error because the ALJ's finding of disability was supported by substantial evidence

6  and because the lay testimony was "neither significant nor probative" to the extent it added nothing

7  to the record. *Id.*

8          This Court agrees with the Court in *Orcutt* that if the testimony of a lay witness merely

9  duplicates the testimony of the claimant, an ALJ's failure to discuss lay testimony may be harmless

10  error, so long as the ALJ provides adequate reasons for rejecting the claimant's testimony and the

11  decision is supported by substantial evidence. Such an approach is consistent with *Nguyen* because

12  in that case, in contrast to *Orcutt*, the ALJ not only failed to give reasons for rejecting the *lay*

13  *witness's* testimony about the claimant's coughing. He also failed to give reasons for rejecting the

14  claimant's own testimony about his coughing. As a result, the ALJ's failure to give reasons for

15  rejecting the lay testimony did not fall into the category of harmless error.

16          The Court disagrees with the Commissioner, however, that the ALJ's failure to discuss the

17  lay testimony was harmless error in this case. In this case, Plaintiff testified at the hearing that she

18  needed to "go and lay down" during the day. AR at 330. In her Daily Activities Questionnaire, she

19  stated that after dropping her children off at school she comes home and goes back to bed for about

20  two hours, that she takes a nap of almost two hours after lunch, and that she takes a nap in the late

21  afternoon after picking her children up from school. AR at 143. Lay witnesses Johnson and

22  Halvorsen make similar statements. Halvorsen states that Plaintiff "comes home and goes back to

23  bed" after she drops her children off at school. AR at 137. She also states that "everytime I call her

24  she's sleeping." *Id.* Johnson states that Plaintiff "goes back to bed for a couple of hours" after

25  dropping her children off at school." AR at 123. She also notes that Plaintiff "doesn't sleep well at

26  night, so she is up most often until 1 or 2 a.m." *Id.*

27          Here, as in *Nguyen*, the ALJ, while acknowledging a diagnosis of chronic fatigue syndrome,

28  *see* AR at 21, failed to address *either* claimant's testimony or the lay testimony that Plaintiff needs to

United States District Court

For the Northern District of California

1   lie down and rest during the day.  The ALJ does cite to Plaintiff's daily activities as a basis for

2   rejecting her testimony about her symptoms but does not specifically mention her testimony

3   concerning her difficulty sleeping at night, her exhaustion during the day, or her frequent need to lie

4   down.  *See* AR at 23.  Nor does he cite to any specific daily activities that would provide substantial

5   evidence for the conclusion that Plaintiff is able to sit or stand for the duration of an eight hour day

6   without lying down to rest.  *See Luna v. Massanari*, 2001 WL 987860 (S.D. Ind.) (holding that ALJ

7   erred in rejecting on basis of daily activities claimant's testimony that he suffered from extreme

8   fatigue and needed to sleep three to four hours a day where none of the reported activities

9   demonstrated that claimant could work longer than three or four hours without lying down).

10        Further, while the Court might be inclined to dismiss as not probative the testimony of

11   Halvorsen on the basis that it is not clear to what extent it is based on personal observation, the lay

12   testimony of Plaintiff's mother is harder to dismiss.  Johnson was living with Plaintiff at the time she

13   completed the Daily Activities Questionnaire and therefore was able to personally observe Plaintiff's

14   activities, including her need to lie down during the day.  Yet the ALJ, without providing any

15   reasons for rejecting this testimony, did not include this limitation in his hypothetical to the

16   vocational expert.  As a result, his finding that there are jobs in the national economy in significant

17   numbers that Plaintiff can perform is not supported by substantial evidence.  *See Nguyen*, 100 F.3d

18   at 1467; *see also Crowell v. Apfel*, 1999 WL 13710 (N.D. Cal.) (holding that ALJ erred by failing to

19   give reasons for discounting lay testimony).

20        **B.    The ALJ's Consideration of Plaintiff's Obesity**

21        Plaintiff asserts that the ALJ erred in failing to consider her obesity in determining her RFC,

22   at Step Five of the analysis.  The Commissioner, on the other hand, asserts that the ALJ adequately

23   addressed the effects of Plaintiff's obesity in his findings concerning Plaintiff's RFC.  The Court

24   concludes that the ALJ adequately addressed Plaintiff's obesity.

25        In developing a claimant's RFC, the ALJ must consider limitations imposed by all of the

26   claimant's impairments in combination, even those that are not severe. SSR 96-8p; *see also Burch v.*

27   *Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  Obesity alone is not a qualifying disability but must be

28   considered in disability assessments and  remains classified as a "determinable impairment that can

United States District Court
For the Northern District of California

1   be the basis for a finding of disability." 64 FR 46122; SSR 02-01.  Where a claimant is obese, the

2   ALJ has a special duty to "fully and fairly develop the record and to assure that the claimant's

3   interests are considered."  *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v.*

4   *Heckler*, 713 F.2d 41, 443 (9th Cir.1983)).  An ALJ breaches this duty by failing properly to include

5   a claimant's obesity in the sequential analysis, which can result in reversible legal error.  *See, e.g.*

6   *Jaroch v. Barnhart*, 2004 WL 1125050 (N.D. Cal.) (holding that ALJ erred in failing to address

7   Plaintiff's obesity at the various steps of the sequential analysis, including determination of RFC).

8          In *Celaya*, a plaintiff who was proceeding in pro se suffered from obesity as well as other

9   impairments. 332 F.3d at 1181.  At Step Three, the ALJ concluded that the plaintiff did not have a

10  listed impairment and therefore was required to consider whether the combined effect of her

11  impairments gave rise to a finding of disability.  *Id*. at 1182.  In conducting this multiple impairment

12  analysis, the ALJ failed to consider – either explicitly or implicitly – the effect of the plaintiff's

13  obesity on her other impairments or her ability to work.  *Id*.  The court held that the ALJ erred,

14  noting that in light of the plaintiff's pro se status and the fact that she was illiterate, the ALJ had an

15  obligation to develop the record on this issue.  *Id*.  The case was remanded for the ALJ to conduct a

16  Step Three multiple impairment analysis that took into account the plaintiff's obesity.  *Id*. at 1183.

17         In *Jaroch*, the court followed *Celaya* in finding that the ALJ erred when he failed to consider

18  the plaintiff's morbid obesity in addressing his RFC at Step Four.  2004 WL 1125050 (N.D. Cal.).

19  There, as in *Celaya*, the ALJ was required to considered the plaintiff's combined impairments to

20  determine RFC.  *Id*.  at *2.  The ALJ was aware of the plaintiff's obesity and referred once or twice

21  to the plaintiff's "size" in his decision.  *Id*. at * 3.  However, he never addressed the obesity as an

22  impairment.  *Id*.  Nor did he develop the record as to the effects of this impairment.  *Id*.  The court

23  concluded that to the extent the ALJ "never considered plaintiff's obesity" in determining RFC and

24  ability to work, a step at which the burden of proof lies with the government, the ALJ committed

25  legal error.  *Id*.

26         Here, in contrast to *Celaya* and *Jaroch*, the ALJ listed Plaintiff's obesity as one of her

27  impairments.  AR at 18.  He also expressly stated that he had considered her obesity when he

28  determined her RFC.  AR at 18.  The Court concludes that the ALJ adequately developed the record

1  with regard to Plaintiff's obesity.  Therefore, the Court rejects Plaintiff's position that the ALJ

2  committed legal error by failing to consider her obesity.

3  **IV.     CONCLUSION**

4          For the foregoing reasons, the Court GRANTS Plaintiff's motion for summary judgment and

5  DENIES Defendant's motion for summary judgment.  The Court reverses the ALJ's decision and

6  remands Plaintiff's claim for further administrative proceedings consistent with this opinion.  Upon

7  remand, the ALJ is instructed to evaluate the lay testimony of Janice Johnson and Stephanie

8  Halvorsen as its relates to Plaintiff's RFC.  In particular, the ALJ should address testimony by these

9  witnesses concerning Plaintiff's fatigue, her poor sleep, and her need to lie down and/or sleep during

10  the day.  Should the ALJ reject this testimony, he shall provide written reasons for doing so that are

11  supported by substantial evidence.  In the alternative, should he determine that Plaintiff's RFC must

12  be revised to include additional limitations, he shall proceed to Step Five to reevaluate whether, in

13  light of any additional limitations, Plaintiff can perform any jobs that are available in significant

14  number in the national economy.

15          IT IS SO ORDERED.

16

17  Dated:  May 8, 2006

18

19  _____

20  JOSEPH C. SPERO
    United States Magistrate Judge

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California